## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| **DAVID PETERS, of Lincoln, County of Penobscot, State of Maine,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **MAINE CRIMINAL JUSTICE ACADEMY, a government agency located in Vassalboro, County of Kennebec, State of Maine,** | ) |
| | ) |
| **BOARD OF TRUSTEES OF THE MAINE CRIMINAL JUSTICE ACADEMY,** | ) |
| | ) |
| **CHARLES J. RUMSEY, IV, in his individual capacity and his official capacity as Chair of the Maine Criminal Justice Academy Board of Trustees,** | )   **Case No.** |
| | ) |
| **JACK D. PECK, JR., in his individual capacity and in his official capacity as the Director of the Maine Criminal Justice Academy,** | ) |
| | ) |
| **LINCOLN E. RYDER, in his individual capacity and in his official capacity as the Assistant Director of the Maine Criminal Justice Academy,** | ) |
| | ) |
| **JOSHUA H. DALEY, in his individual capacity and in his official capacity as BLETP Training Coordinator and Training Coordinator for the Maine Criminal Justice Academy,** | ) |
| | ) |
| **DARIN GILBERT, in his individual and official capacity as Training Coordinator at the Maine Criminal Justice Academy and Cadet Disciplinary Officer for the 46th BLETP,** | ) |
| | ) |

1

SERGEANT JOSEPH A. MILLS, in his )
individual capacity and in his official )
capacity as Cadre Supervisor for the )
Maine Criminal Justice Academy, )
                                                        )
ASSISTANT ATTORNEY GENERAL )
ANDREW L. BLACK, in his individual )
capacity and in his official capacity as )
Assistant Attorney General in the )
Office of the Maine Attorney General )
and Chief of the Professional and )
Financial Regulation Division, )
                                                        )
CHIEF DETECTIVE ANNA LOVE, )
in her individual capacity and in her )
official capacity as a Maine Criminal )
Justice Academy Board Member, )
                                                        )
COMMISSIONER RANDALL A. )
LIBERTY, in his individual capacity and )
in his official capacity as a Maine )
Criminal Justice Academy Board )
Member, )
                                                        )
MAJOR JASON KING, in his individual )
capacity and in his official capacity as )
a Maine Criminal Justice Academy )
Board Member, )
                                                        )
DEFENDANTS JOHN AND JANE )
DOES NOS. 1-10, )
                                                        )
                        Defendants. )

## COMPLAINT

NOW COMES Plaintiff David Peters, by and through undersigned counsel, and

complains against Defendants Maine Criminal Justice Academy, Board of Trustees of the Maine

Criminal Justice Academy, Charles J. Rumsey, IV, Jack D. Peck, Jr., Lincoln E. Ryder, Joshua

H. Daley, Darin Gilbert, Sergeant Joseph A. Mills, Assistant Attorney General Andrew L. Black,

Chief Detective Anna Love, Commissioner Randall A. Liberty, Major Jason King, and

Defendants John and Jane Does Nos. 1-10, as follows:

## I.    INTRODUCTION

1.    This is a civil action under 42 U.S.C. § 1983 seeking redress for the violation of Plaintiff

David Peters's rights under the Fourteenth Amendment to the United States Constitution and for

related state-law harms.

2.    Plaintiff David Peters ("Peters") is a long-serving Maine law-enforcement and corrections

professional whose nearly two decades of work as a part-time law-enforcement officer and

corrections officer were abruptly and permanently derailed by the conduct of the Maine Criminal

Justice Academy ("MCJA"), its Board of Trustees, its administrators, and its training stuff.

3.    In October 2024, while enrolled as a cadet in the 46th Basic Law Enforcement Training

Program ("BLETP"), Peters was subjected to an oleoresin capsicum ("OC" or "pepper spray")

exposure training exercise that deliberately induced temporary blindness, pain, respiratory distress,

and confusion. Immediately thereafter, while still suffering the predictable debilitating effects of

OC exposure and without adequate safeguards, supervision, or training tailored to those

impairments, Peters was not told in advance and ordered to handcuff and search a fellow cadet of

the opposite sex in a scenario designed and controlled by MCJA instructors.

4.    MCJA had full knowledge that OC exposure severely impairs vision, fine motor control,

and cognitive processing, and yet MCJA knowingly combined that impairment with a high-risk,

bodily intrusive cross-gender "search" exercise involving a female cadet in shorts and a T-shirt,

without any MCJA protocol regarding Mechanics of Arrest, Restraint and Control ("MARC")

training protocols.

5.    In the immediate aftermath of that flawed training design and execution, Peters was

accused of having "groped" the female cadet, Cadet Marije van der Hilst ("Cadet MVH"), in a

3

sexual manner. A Maine State Police Major Crimes Unit criminal investigation was opened. After that investigation, ultimately no criminal charges were brought against Peters and the investigation was closed or otherwise resolved in his favor.

6.      Despite the absence of a criminal charge or conviction, and despite the existence of video footage and other exculpatory or mitigating evidence, MCJA and its Board of Trustees seized upon the incident to summarily remove Peters from the BLETP, to sustain his dismissal after a biased and structurally defective hearing, and ultimately to revoke his long-held certificates of eligibility to act as a corrections officer and as a law-enforcement officer in Maine, effective December 21, 2025. See Notice of Intent to Revoke, Board Case 2024089, dated November 20, 2025, issued under 25 M.R.S. § 2806A(4)(C) and 25 M.R.S. § 2806A(5)(F).

7.      In doing so, Defendants deprived Peters of constitutionally protected property and liberty interests—his existing certifications, his chosen occupation in law enforcement and corrections, and his professional reputation—without due process of law, in violation of the Fourteenth Amendment. Defendants further acted arbitrarily and capriciously, and with deliberate indifference to the foreseeable consequences of their own training decisions and their own conflicts of interest.

8.      Peters has suffered and continues to suffer severe personal humiliation, reputational stigma, lost wages and benefits, loss of earning capacity, and the destruction of his law-enforcement and corrections career.

9.      Peters seeks all available remedies under federal and Maine law, including compensatory and punitive damages from individual defendants, declaratory and injunctive relief restoring his certifications and expunging the unconstitutional findings, and reasonable attorneys' fees and costs under 42 U.S.C. § 1988.

4

## II.    JURISDICTION AND VENUE

10.    This Court has subject-matter jurisdiction over Peters's federal constitutional and civil-rights claims under 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

11.    This Court has supplemental jurisdiction over Peters's related state-law claims under 28 U.S.C. § 1367 because those claims arise from the same nucleus of operative fact as his federal claims.

12.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Peters's claims occurred in the District of Maine, including at MCJA's facility in Vassalboro, Kennebec County, Maine, and because one or more Defendants reside or conduct official business in this District.

## III.    PARTIES

13.    Plaintiff David Peters is an adult resident of Lincoln, Penobscot County, Maine, with a mailing address of 19 Lakeview Street, Lincoln, Maine 04457. At all times relevant, Peters was employed as a part-time and then provisional full-time law-enforcement officer, and as a corrections officer, in the State of Maine, and held certificates of eligibility issued by MCJA.

14.    Defendant Maine Criminal Justice Academy ("MCJA") is an agency within the Maine Department of Public Safety, located at 15 Oak Grove Road, Vassalboro, Maine 04989. Pursuant to 25 M.R.S. §§ 2803A, 2804B, 2804C, and 2806A, MCJA is charged with training and certifying law-enforcement and corrections officers and with enforcing disciplinary standards, including revocation of certificates of eligibility.

15.    Defendant Board of Trustees of the Maine Criminal Justice Academy ("MCJA Board") is the governing body of MCJA established under Maine law and charged with, among other things, protecting the public health and welfare by ensuring that the public is served by competent and honest criminal justice practitioners, and by issuing, suspending, and revoking

certificates of eligibility for law-enforcement and corrections officers. See 25 M.R.S. § 2801(2); 25 M.R.S. § 2806A.

16.    Defendant Charles J. Rumsey, IV ("Rumsey") is, and at all relevant times was, the Chair of the MCJA Board of Trustees. He signed the Amended Notice of Hearing dated December 13, 2024, and the Notice of Decision to Revoke Certificate of Eligibility dated November 20, 2025, in Board Case 2024089. Rumsey is sued in his individual capacity for damages and in his official capacity for declaratory and injunctive relief.

17.    Defendant Jack D. Peck, Jr. ("Peck") was at all relevant times, the Director of the MCJA. On or about November 5, 2024, he caused to be issued the Notification of Dismissal and Suspension from the BLETP to Peters, concurring in Training Coordinator Darin Gilbert's recommendation that Peters be dismissed from the BLETP and immediately suspended. Peck is sued in his individual capacity for damages and in his official capacity for declaratory and injunctive relief.

18.    Defendant Lincoln E. Ryder ("Ryder") was at intermittent times, the Assistant Director of MCJA and participated in the administration and oversight of the 46th BLETP and in MCJA's handling of the incident involving Peters. Ryder is sued in his individual and official capacities. He is the current MCJA director.

19.    Defendant Joshua H. Daley ("Daley"), was at intermittent times, a Training Coordinator at MCJA and the BLETP Training Coordinator. Daley was the lead MARC instructor for the 46th BLETP and designed and implemented the Mechanics of Arrest, Restraint and Control portions of the curriculum, including the handcuffing and search training relevant here. Daley is sued in his individual and official capacities. Daley is currently the Assistant Director of MCJA.

20.     Defendant Darin Gilbert ("Gilbert") is, and at all relevant times was, a Training Coordinator at MCJA and served as the Cadet Disciplinary Officer for the 46th BLETP pursuant to the BLETP Cadet Disciplinary Code. On November 5, 2024, Gilbert authored the "Report to Director Jack D. Peck re: Violations of Maine Criminal Justice Academy Rules by Cadet David Peters," recommending that Peters be dismissed from the 46th BLETP under Article III, Section 5 (Unprofessional Conduct) and Section 6 (Sexual Harassment and Discrimination) of the Cadet Disciplinary Code. Gilbert is sued in his individual and official capacities.

21.     Defendant Sergeant Joseph A. Mills ("Mills") is, and at all relevant times was, a Cadre Supervisor at MCJA, assigned to the 46th BLETP. Mills supervised aspects of the OC exposure training on October 29, 2024, observed portions of the interaction between Peters and Cadet MVH, and authored memoranda concerning the incident that were used to support Peters's dismissal and, later, revocation. Mills is sued in his individual and official capacities. Mills is currently the Senior Cadre Supervisor and oversees the entire BLETP staff, including Officer Derek Drouin – Auburn Police Department, who supervised and facilitated the aforementioned "training exercise."

22.     Defendant Assistant Attorney General Andrew L. Black ("Black") is, and at all relevant times was, an Assistant Attorney General in the Office of the Maine Attorney General and Chief of the Professional and Financial Regulation Division. Black served as legal advisor to the MCJA Board hearing panel in Peters's disciplinary appeal and simultaneously acted as the de facto prosecutor by compiling and offering exhibits, coordinating state witnesses, and advising the panel on the law and drafting its decision. See, e.g., Black's February 5, 2025, email identifying an extensive list of cadets and instructors to be called as state witnesses and preparing the exhibit book for the panel. Black is sued in his individual and official capacities.

7

23.     Defendants Chief Detective Anna Love, Commissioner Randall A. Liberty, and Major

Jason King (collectively, the "Hearing Panel Defendants") are MCJA Board members who,

pursuant to Article IV, Section 4(C) of the BLETP Cadet Disciplinary Code, were appointed to

serve as the three-member Hearing Panel for Peters's February 18, 2025, adjudicatory hearing.

They are sued in their individual capacities for damages and in their official capacities for

declaratory and injunctive relief.

24.     Defendants John and Jane Does 1-10 are additional MCJA instructors, cadre members,

Board members, and/or Department of Public Safety officials whose true names and capacities

are presently unknown to Peters, but who participated in the planning, execution, investigation,

prosecution, adjudication, or ratification of the challenged training exercise, dismissal, and

certification revocation. They are sued in their individual and official capacities.

## IV.     FACTUAL ALLEGATIONS

### A. *Peters's Law-Enforcement and Corrections Career*

25.     Peters has dedicated much of his adult life to public safety in Maine. On April 25, 2007,

he completed law-enforcement preservice school and, on May 11, 2007, the MCJA Board issued

Peters a certificate of eligibility to serve as a part-time law-enforcement officer. See Notice of

Intent to Revoke, Preliminary Findings of Fact ¶ 1.

26.     Over the next sixteen years, Peters served as a part-time law-enforcement officer for

multiple agencies including the Lincoln Police Department (various periods between 2006 and

2011), the East Millinocket Police Department (from November 15, 2013, to May 10, 2017, and

again from May 30, 2023, until November 6, 2024), the Brownville Police Department (July 16,

2014, to April 1, 2017), the Milo Police Department (April 1, 2017, to August 9, 2022), and the

University of Maine Police Department (part-time from July 14, 2022, to October 1, 2022, and provisional full-time from October 2, 2022, to May 25, 2023).

27.    Peters also worked extensively as a corrections officer. On November 17, 2014, he completed the Basic Juvenile Corrections (Basic Corrections Training) program, and on January 2, 2015, the MCJA Board issued him a certificate of eligibility to be a corrections officer in Maine. He was employed as a corrections officer by the Mountain View Youth Development Center from November 17, 2014, to November 1, 2017, and by the Mountain View Correctional Facility from November 1, 2017, to September 29, 2022.

28.    As reflected in his official MCJA transcript, Peters successfully completed numerous MCJA-approved courses and certifications over the years, including Law Enforcement Pre-Service School, Basic Juvenile Corrections, Standardized Field Sobriety Testing (24 hours, September 30, 2024), and Breath Testing Device Operator (8 hours, October 3, 2024).

29.    By August 2024, Peters had a lengthy record of service without any criminal conviction and without any prior discipline by MCJA resulting in suspension or revocation of his certificates.

   *B. Enrollment in the 46th BLETP and the Honor Code Regime*

30.    On August 19, 2024, Peters began attending the 46th BLETP at MCJA's Vassalboro campus, seeking full-time law-enforcement certification. See Amended Notice of Hearing, Alleged Facts ¶¶ 6-7.

31.    On that date, Peters received and was given the opportunity to read the BLETP Cadet Orientation & Curriculum Guide and the Cadet Disciplinary Code. The Guide includes a detailed Honor Code and Misconduct section that defines "Honor Code" violations, "Serious General

Misconduct," "Sexual Harassment," and "Harassment," and sets out an extensive Professional

Value System, including expectations for integrity, professionalism, and attention to detail.

32.     Article III, Section 3 of the Cadet Disciplinary Code states that Honor Code violations

"will result in appropriate disciplinary sanctions and may result in dismissal."

33.     The Honor Code emphasizes that "[s]exual Harassment is illegal and explicitly forbidden.

Any form of sexual harassment will not be tolerated at the Academy." It provides that

"[b]ehavior that is sexual in nature may be verbal . . . nonverbal . . . or physical such as

massaging, touching, deliberate brushing up against someone, hugging, pinching, grabbing, or

actual sexual assault," and warns that "[a] Cadet sexually harassing another Cadet will be

grounds for immediate suspension from the Academy by the Academy Director."

34.      Article III, Section 5 defines "Unprofessional Conduct" to include harassment, profanity,

discourtesy, coarse manners, rudeness, and impoliteness, and provides that such conduct "will

result in appropriate disciplinary sanctions and may result in dismissal."

35.     Article III, Section 6 reiterates that "[s]exual harassment and discrimination based on

race, color, sex, religion, age, national origin, sexual orientation, or disability are prohibited,"

and lists "[u]nwelcome sexual advances or contact, gestures, suggestive or lewd remarks" as

examples of prohibited conduct.

36.     At all relevant times, MCJA administrators, cadre, and instructors—including Peck,

Ryder, Daley, Gilbert, and Mills—were responsible for designing and implementing training

scenarios and enforcing the Cadet Disciplinary Code and Honor Code in a fair, consistent, and

constitutionally compliant manner.

C. *OC Exposure Training on October 29, 2024*

37.      On October 29, 2024, during the evening hours between approximately 6:15 p.m. and

9:00 p.m., the 46th BLETP class participated in an OC exposure training exercise in and around

the Tactical ("TAC") Center on the MCJA campus.

38.      During this exercise, cadets were individually sprayed in the face with OC by instructor

Officer Derek Drouin of the Auburn Police Department, under MCJA's supervision, and

immediately tasked with completing several physically and cognitively demanding drills while

suffering the intense burning, tearing, visual impairment, and respiratory distress that are

inherent and well-known consequences of OC exposure.

39.      According to Cadre Supervisor Sgt. Joseph Mills's October 30 and 31, 2024, memoranda,

cadets exposed to OC were required to navigate from the exposure area into the TAC Center,

perform knee strikes on strike pads, secure a subject in handcuffs, conduct a search, recite the

Oath of Honor, and then proceed to decontamination.

40.      The handcuffing and search segment required cadets who had just been sprayed with OC

to handcuff and "search" a volunteer "arrestee" cadet. The exercise, by design, required physical

contact with another person's body and clothing and raised obvious privacy and dignity

concerns, especially for cross-gender interactions.

41.      For this exercise, female cadet Marije van der Hilst (Cadet "MVH") volunteered to act as

one of the compliant "arrestee" subjects to be handcuffed and searched by OC-sprayed cadets. At

the time of the incident involving Peters, Cadet MVH was wearing shorts and a T-shirt, leaving

significant portions of her legs bare.

42.      Prior to October 29, 2024, MCJA's MARC training, as claimed by Daley, but later

unsubstantiated, allegedly instructed cadets on compliant handcuffing and search techniques.

Cadets were allegedly explicitly told they must instruct subjects to "spread your feet" rather than "spread your legs" to avoid suggestive language, that they must not touch bare skin when conducting searches, and that when searching a female's chest area, they must use a single hand formed as a "knife edge" to move quickly down the center of the chest and then quickly under the breast, without allegedly grabbing or cupping the breasts. None of these techniques are substantiated with any documentation.

43.     MCJA administrators and trainers—including Daley and Gilbert—knew that OC exposure dramatically impairs vision, sensory-motor control, and judgment, yet they insisted that cadets immediately perform cross-gender handcuffing and "search" tasks, including on a female in shorts and T-shirt, at a point in time when the likelihood of inadvertent or awkward contact was foreseeable and exceptionally high.

44.     MCJA did not adopt or enforce adequate safeguards to account for OC-induced impairment in this context. It did not require male cadets to avoid searching female "arrestees" while still acutely impaired. It did not structure the exercise to minimize the risk that a split-second misjudgment by an impaired cadet would be mischaracterized as sexual misconduct and used to end that cadet's career.

   *D.  The Peters / MVH Interaction During OC Training*

45.     After being sprayed with OC, Peters, like his classmates, experienced severe burning and vision impairment. He proceeded from the spray station into the TAC Center, where he performed the required knee-strike drill and then moved to the handcuffing and search station where Cadet MVH was acting as the compliant subject.

46.     According to Cadet MVH's written complaint emailed on October 30, 2024, multiple other cadets had already handcuffed and searched her "with no issues." When Peters approached,

he grabbed the training handcuffs and instructed Cadet MVH to turn around, place her hands behind her back, and "spread [her] legs."

47.    Under the intense and distracting effects of OC, Peters's verbal misstep and awkward attempt to correct it occurred in a high-stress environment intentionally created by MCJA. The misworded phrase was consistent with the standard tactical rationale for widening a subject's base for officer safety, but, in the Academy's Honor Code regime, could be perceived as suggestive when stripped of context.

48.    Peters handcuffed Cadet MVH as required. From his impaired vantage point and under time pressure in the simulated scenario, Peters then began the "search" portion of the drill.

49.    The parties dispute precisely what occurred in the ensuing seconds. MVH later claimed that Peters "dragged his hands up [her] legs," that he "grabbed [her] breasts and linger[ed]," and that his hands moved to her "groin and private area" and "buttocks" while an instructor twice told him he was searching a female. Peters consistently maintained during the Major Crimes Unit interview that, in his haste and impaired state, he believed he was searching a male, that he followed his standard male-subject search sequence (waist, down the front, arms, back), and that any contact with MVH's breasts was inadvertent, brief, the overall search taking no longer than 6 seconds and was not sexually motivated.

50.    Mills, who was monitoring the exercise, observed only a portion of the interaction. In his written report he stated that from his vantage point he saw Peters positioned behind MVH, saw him reach around to search "her chest area," saw MVH twist away as his hand came into contact with her body, and that by the time he intervened the search had effectively ended. Mills also reported that MVH was "smiling" when he reached them and that, when asked, she indicated she was "fine" and that it was "incident to the training exercise."

51.    Immediately after the search, MVH, still under OC-related physical stress, went to a bathroom and experienced nausea and dry heaving. She initially told classmates and the Class President that she considered the contact "incidental" given the nature of the training. By the afternoon of October 30, 2024, however, after further reflection and discussion, she felt uncomfortable about the interaction and reported it to Mills and Cadre member Detective Jacob Richards in the billets.

52.    Acting under MCJA's Honor Code procedures, MVH submitted a written complaint to Mills on October 30, 2024, which was forwarded to Academy leadership and, later, to the Maine State Police Major Crimes Unit for criminal investigation.

   *E. Criminal Investigation and Outcome*

53.    On information and belief, at the request of MCJA Director Peck, the Maine State Police Major Crimes Unit, including Detective Sergeant Ryan Brockway and Detective Kasey MacDonald, opened a criminal investigation into whether Peters's conduct during the training exercise constituted sexual assault or the Class D crime of assault under 17-A M.R.S. § 207(1)(A), which defines assault as "intentionally, knowingly or recklessly caus[ing] bodily injury or offensive physical contact to another person." See Notice of Intent to Revoke, Applicable Law ¶ 2.

54.    The Major Crimes Unit interviewed MVH and Peters and reviewed video footage from the TAC Center. Peters was administered Miranda warnings and cooperated in a recorded interview of approximately forty-six minutes.

55.    After the investigation was completed, the case was referred to the appropriate District Attorney's Office for review. No criminal complaint, information, or indictment was ever filed

against Peters arising out of the October 29, 2024, OC-training incident. The criminal matter was closed as the prosecution agency declined prosecution.

56.     Thus, while MCJA later declared in its Notice of Intent to Revoke that Peters's conduct "constitutes the Class D crime of assault under 17-A M.R.S. § 207(1)(A)" and used that conclusion to justify revocation, no court, jury, or prosecutor has ever found or alleged that Peters committed such a crime or that probable cause of a crime existed.

*F. Gilbert's November 5, 2024, Report and Peck's Summary Dismissal*

57.     On the morning of November 5, 2024, Peck advised Gilbert of the MVH complaint and the incident. At approximately 2:00 p.m. that day, Peck assigned Gilbert, in his capacity as Cadet Disciplinary Officer, to investigate the matter and report his findings and recommendations. Gilbert was told that the Major Crimes Unit was conducting a criminal investigation but was not to sit in on those interviews.

58.     Without interviewing Peters, without independently interviewing key witnesses such as MVH or the many cadets present, and while the criminal investigation was still pending, Gilbert authored a "Report to Director Jack D. Peck re: Violations of Maine Criminal Justice Academy Rules by Cadet David Peters" dated November 5, 2024.

59.     Gilbert's report relied heavily on MVH's written complaint, Mills's limited observation, and the investigators' summary of their interviews. Gilbert acknowledged that he had not had time to conduct follow-up interviews with other cadets and recommended that "further interviews should be conducted relating to Cadet Peters['s] conduct with other female cadets," but nonetheless concluded that there was "reasonable cause" to find that Peters had violated Article III, Section 5 (Unprofessional Conduct) and Section 6 (Sexual Harassment and Discrimination) of the Cadet Disciplinary Code and the Honor Code.

60.     Gilbert further opined that Peters's OC-training conduct "may have resulted in criminal action," and that his actions were "serious and criminal in nature," despite the absence of any criminal charge or even probable cause.

61.     That same day, November 5, 2024, Peck issued a letter to Peters entitled "Notification of Dismissal and Suspension from the BLETP." Peck summarized Gilbert's report and stated that he concurred in the recommendation to dismiss Peters from the 46th BLETP for violations of the Cadet Disciplinary Code. Peck further ordered Peters's immediate suspension from the BLETP pending any hearing, citing Article IV, Section 4(B) of the Code and finding that Peters's continued presence would "pose a risk to the health and safety of the alleged victim and the general order of the BLETP" and would disrupt training.

62.     Peck's decision to dismiss and immediately suspend Peters was made without affording Peters any pre-deprivation opportunity to respond, to see the evidence, or to have counsel present. It was issued before completion of the criminal investigation, before any neutral factfinder had evaluated the video evidence, initiated purely in the biased interests of MCJA with Darin Gilbert as the investigator, and in a climate of zero-tolerance rhetoric concerning sexual harassment.

63.     Peck's letter advised Peters that he could contest his dismissal by requesting a hearing before an MCJA board panel but provided only three days—from November 5 until 5:00 p.m. on November 8, 2024—to do so.

64.     On November 5, 2024, Peters timely requested a hearing in writing, expressly stating that he did "not feel that a thorough investigation was conducted," that "some facts were not accurately represented in the final outcome and disciplinary action decision," and that he desired

an opportunity to present his side of the story and to review video footage from all TAC Center cameras and interview recordings.

65.     On or about November 6, 2024, East Millinocket Police Department terminated Peters's provisional full-time employment as a law-enforcement officer as a direct consequence of his dismissal from the BLETP.

> G. *Adjudicatory Hearing and Structural Bias*

66.     On December 13, 2024, MCJA Board Chair Rumsey issued an Amended Notice of Hearing, replacing an earlier Notice of Hearing dated November 14, 2024. The Amended Notice scheduled Peters's adjudicatory hearing for February 18, 2025, at 9:00 a.m. at MCJA, before a three-member Hearing Panel consisting of Chief Detective Anna Love (Panel Chair), Commissioner Randall Liberty, and Major Jason King.

67.     The Amended Notice explicitly stated that the purpose of the hearing was to determine by a preponderance of the evidence whether Peters had engaged in "verbal sexual harassment," "physical sexual harassment," "unprofessional conduct," and "sexual harassment" of a fellow cadet through "unwelcome sexual conduct" and "suggestive or lewd remarks," under Article III, Sections 3, 5, and 6 of the Cadet Disciplinary Code.

68.     The Amended Notice also expanded the factual allegations to include various alleged comments and behaviors by Peters earlier in the 46th BLETP involving other female cadets, including jokes of a sexual nature, alleged remarks about a cadet's hair "almost touch[ing] [her] butt," an alleged comment to a cadet eating a banana that it looked like she was "sucking dick right now," and alleged inappropriate physical contact during MARC drills. These allegations were compiled long after the OC-training incident and were never contemporaneously charged or disciplined at the Academy.

69.     Assistant Attorney General Andrew Black, Chief of the Professional and Financial Regulation Division, served a dual and inherently conflicted role in these proceedings. As described in the Amended Notice, Black was the Hearing Panel's "legal advisor," charged with advising the Panel, helping conduct the evidentiary hearing, and drafting its decision. At the same time, Black actively prosecuted the case against Peters: he compiled the State's "Exhibit Book," selected and prepared State witnesses, coordinated their appearance with Training Coordinator Daley and others, and advocated for disciplinary action.

70.     In a February 5, 2025, email to Peters's counsel, Black identified an extensive list of State witnesses—including at least sixteen different cadets and instructors—and attached a multi-hundred-page exhibit book for the Hearing Panel's benefit. Black made clear that he, not a neutral clerk, would be framing the evidence and the issues for the Panel prior to the hearing.

71.     The Hearing Panel members—all high-ranking law-enforcement and corrections officials—were under institutional pressure to demonstrate that MCJA takes allegations of sexual harassment seriously, particularly in a highly public, open-to-the-public hearing required by 25 M.R.S. § 2806A(10). A finding in favor of Peters risked political or public criticism.

72.     At no point did MCJA, the Board, or the Hearing Panel implement firewalls or appoint separate, independent counsel for the prosecution and for the Panel. Nor did they provide Peters with a truly neutral decisionmaker independent of MCJA's management and the Attorney General's Office.

73.     On information and belief, the Hearing Panel credited MVH's testimony and other cadets' hearsay accounts over Peters's explanation and the objectively ambiguous or exculpatory aspects of the TAC Center video and issued a Decision and Order upholding Peck's dismissal of Peters from the 46th BLETP.

74.    Peters had no further internal right of appeal within MCJA concerning his BLETP dismissal. He was effectively barred from completing full-time law-enforcement training in Maine and functionally prohibiting him from obtaining future certification as a full-time officer at any time in the near future.

### H.  Notice of Intent to Revoke Peters's Certificates of Eligibility

75.    Having already terminated Peters's participation in the BLETP and resulting full-time law-enforcement certification prospects, MCJA and its Board went further. On November 20, 2025—more than a year after the OC training incident and approximately nine months after the BLETP Hearing Panel's decision—MCJA Board Chair Rumsey sent Peters a "Notice of Decision to Revoke Certificate of Eligibility and Opportunity for Adjudicatory Hearing" in Board Case 2024089 (referred to herein, consistent with the Board's papers, as the "Notice of Intent to Revoke").

76.    That Notice stated that, on November 14, 2025, the Board had voted to revoke Peters's certificates of eligibility to act as a corrections officer and a law-enforcement officer in Maine, effective December 21, 2025, under 25 M.R.S. § 2806A(4)(C) and § 2806A(5)(F).

77.    The Notice's Preliminary Findings of Fact incorporated the entire BLETP dismissal file "In Re: David Peters" and recited Peters's full employment and certification history back to 2006, as well as the allegations concerning his conduct at the 46th BLETP, including the OC-training incident with MVH.

78.    Under "Preliminary Conclusions of Law," the Board declared that by "grabbing MVH's breasts and moving his hands to her groin area and making sexually suggestive remarks during a search exercise," Peters had "knowingly, intentionally or recklessly caused offensive physical contact to another, which conduct constitutes the Class D crime of assault under 17-A M.R.S.

19

207(1)(A) and is a basis for the Board to revoke Mr. Peters's certificate(s) of eligibility pursuant to 25 M.R.S. 2806A(5)(F)."

79.    The Board reached this legal conclusion without any criminal conviction, without any judicial finding under 17-A M.R.S. § 207, and in the face of the Major Crimes Unit and District Attorney's decision not to prosecute. The Board effectively sat as judge, jury, and prosecutor in declaring Peters a criminal "assailant" under Maine law.

80.    The November 20, 2025, Notice informed Peters of his right to request an adjudicatory hearing under 25 M.R.S. § 2806(A)(4)(C) and 5 M.R.S. §§ 9051-9064, to be held by the same Board that had already voted to revoke his certificates. It further provided that, if Peters failed to timely request such a hearing, the Board's preliminary findings and revocation decision would become final as of December 21, 2025.

81.    The Board's action effectively stripped Peters of all existing law-enforcement and corrections certificates that he had held for years, eliminated his ability to work in Maine as a law-enforcement or corrections officer, and branded him as a perpetrator of sexual assault, causing severe and enduring reputational harm in a close-knit professional community.

82.    On information and belief, Peters has taken all steps required to preserve his rights to challenge the revocation through available administrative processes, but those processes are structurally tainted by the MCJA process and procedures, and the same conflicts of interest and biases that corrupted the BLETP hearing are not an adequate substitute for federal judicial review of constitutional claims.

   *I.    Damages and Ongoing Harm*

83.    As a direct and proximate result of Defendants' actions and omissions, Peters lost his provisional full-time law-enforcement employment with East Millinocket Police Department as

20

of November 6, 2024, and has been unable to secure comparable employment in law enforcement or corrections in Maine.

84.    The revocation of his certificates of eligibility to act as a law-enforcement officer and corrections officer permanently forecloses the occupation to which he has devoted nearly two decades of training and service leaving him with limited or no comparable career prospects with the same earning opportunities previously afforded to Peters.

85.    The public and official branding of Peters as a sexual harasser and as a perpetrator of the "Class D crime of assault," without a criminal conviction and following procedurally deficient and structurally biased administrative proceedings, has inflicted severe reputational damage, humiliation, stress, anxiety, and depression, and has impaired his relationships and standing in his community and the communities which he previously served as a law enforcement officer.

86.    Peters has incurred, and will continue to incur, substantial financial losses, including lost wages, lost benefits, lost future earning capacity, and out-of-pocket expenses related to defending himself in the criminal investigation, BLETP hearing, and revocation proceedings as well as forfeited retirement benefits.

87.    Peters has also incurred and will incur attorneys' fees and litigation costs in pursuing this action and in attempting to vindicate his rights.

## V.    CAUSES OF ACTION

### COUNT I – 42 U.S.C. § 1983: FOURTEENTH AMENDMENT PROCEDURAL DUE PROCESS

**(Against Rumsey, Peck, Ryder, Daley, Gilbert, Mills, Black, Love, Liberty, King, and Does, in Individual and Official Capacities)**

88.    Peters realleges and incorporates by reference paragraphs 1 through 87 as if fully set forth herein.

89.     At all relevant times, Defendants Rumsey, Peck, Ryder, Daley, Gilbert, Mills, Black, Love, Liberty, King, and Does were acting under color of state law within the meaning of 42 U.S.C. § 1983.

90.     Peters possessed constitutionally protected property interests in his certificates of eligibility to act as a law-enforcement officer and corrections officer, which had been duly issued by MCJA under 25 M.R.S. §§ 2804B and 2806A and which carried with them a legitimate claim of entitlement to continue in his chosen profession, absent good cause and fair procedures.

91.     Peters also possessed a constitutionally protected liberty interest in pursuing his chosen occupation as a law-enforcement and corrections officer and in his reputation, including a liberty interest in not being stigmatized by the State as a sexual harasser and assailant in conjunction with the alteration or extinguishment of a tangible legal right or status.

92.     By summarily dismissing Peters from the BLETP and immediately suspending him on November 5, 2024, without providing any meaningful pre-deprivation process—such as prior notice of the charges, disclosure of the evidence, and an opportunity to respond before a neutral decisionmaker—Defendant Peck, with the assistance and recommendation of Gilbert and Mills, deprived Peters of significant property and liberty interests without due process of law.

93.     The BLETP adjudicatory hearing held on February 18, 2025, did not cure these constitutional deficiencies. The hearing was infected by structural conflicts of interest and an unconstitutional risk of bias, including the dual role of Assistant Attorney General Black as both the de facto prosecutor and the Panel's "legal advisor," his control over witness selection and the compilation and framing of the "Exhibit Book," and his participation in drafting the hearing decision while simultaneously advocating for the Academy's outcome.

94.     The hearing process was further tainted by the Panel's composition and institutional alignment. The hearing was conducted before a three-member panel consisting entirely of high-ranking law-enforcement and corrections officials serving on the MCJA Board of Trustees. In the context of a public disciplinary proceeding required by 25 M.R.S. § 2806A(10), those decisionmakers faced obvious institutional and reputational pressures to validate the Academy's initial removal decision and to demonstrate "zero tolerance" in response to allegations framed as sexual misconduct, rather than to neutrally evaluate disputed evidence from an inherently compromised training scenario.

95.     The procedures employed in the BLETP dismissal process and the subsequent revocation process were substantively inadequate given the magnitude of the interests at stake. Among other defects, Peters was not provided timely access to all relevant and/or complete video footage and investigative materials before decisive steps were taken; exculpatory or mitigating aspects of the TAC Center video and the OC-induced impairment created by MCJA were disregarded; and the process permitted the admission and crediting of hearsay and rumor concerning alleged prior remarks and interactions with other cadets that were compiled long after the core incident and were not contemporaneously charged or adjudicated in a fair manner.

96.     The MCJA Board's November 20, 2025, Notice of Intent to Revoke compounded the deprivation. The Board declared, as a matter of law, that Peters's conduct "constitutes the Class D crime of assault" under 17-A M.R.S. § 207(1)(A) and used that legal conclusion as a basis to revoke his certificates under 25 M.R.S. § 2806A(5)(F), notwithstanding that no criminal charge was filed and no court made any finding of guilt.

97.     The revocation process also failed to provide constitutionally adequate safeguards. The Board treated the BLETP dismissal record as foundational while refusing to provide a truly

neutral, conflict-free forum to test the accuracy and fairness of that record. It offered Peters only an illusory opportunity for a hearing before the very Board that had already voted to revoke his certificates, without meaningful separation of prosecutorial and adjudicative functions and without adequate notice and neutral adjudication proportionate to the gravity of the stigmatizing and career-ending charges.

98.    Defendants' actions and omissions thus deprived Peters of his property and liberty interests without the "notice and opportunity for hearing appropriate to the nature of the case" guaranteed by the Fourteenth Amendment's Due Process Clause.

99.    The procedural due-process rights violated here were clearly established at the time of the events in question, such that a reasonable official in Defendants' positions would have understood that summarily removing a cadet, sustaining that removal through structurally biased procedures, and then revoking long-held certifications while publicly branding the cadet as a criminal assailant, violated the Constitution. See *Stein v. Maine Criminal Justice Academy,* 2014 ME 82, 95 A.3d 612; *Witham v. Board of Trustees of the Maine Criminal Justice Academy,* 2023 ME 13, 290 A.3d 65.

100.    As a direct and proximate result of these procedural due-process violations, Peters suffered the damages described above, including loss of employment, loss of certifications, lost income and earning capacity, reputational harm, emotional distress, and other injuries.

### COUNT II – 42 U.S.C. § 1983: FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS
### (Against Peck, Ryder, Daley, Gilbert, Mills, Rumsey, Black, Love, Liberty, King, and Does, in Individual and Official Capacities)

101.    Peters realleges and incorporates by reference paragraphs 1 through 100 as if fully set forth herein.

102.   At all relevant times, Defendants Peck, Ryder, Daley, Gilbert, Mills, Rumsey, Black, Love, Liberty, King, and Does acted under color of state law within the meaning of 42 U.S.C. § 1983.

103.   The Fourteenth Amendment's substantive component protects individuals against government action that is so arbitrary, oppressive, or conscience-shocking as to violate fundamental notions of fairness and ordered liberty, including the arbitrary destruction of a person's chosen occupation and reputation in the absence of a rational and proportionate basis.

104.   MCJA and its training staff, including Daley and Mills, deliberately created a hazardous and constitutionally sensitive situation by combining OC exposure, known by MCJA to cause temporary blindness, disorientation, and impaired judgment along with a cross-gender handcuffing and "search" scenario involving a minimally clothed female cadet.

105.   Rather than structure the OC exercise to minimize privacy-intrusive contact or prohibit cross-gender searches by cadets who were still acutely impaired, MCJA affirmatively required Peters, while suffering the effects of OC, to conduct a full-body "search" of a female "arrestee" in shorts and a T-shirt, in a high-stress, videotaped environment where the foreseeable risk of awkward, inadvertent, or misinterpreted contact was exceptionally high.

106.   When the predictable occurred—a disputed and ambiguous moment of contact during a compromised training scenario—MCJA officials, including Peck and Gilbert, seized on the incident to immediately end Peters's participation in the BLETP, characterize him as a sexual harasser, and later brand him a criminal assailant under 17-A M.R.S. § 207(1)(A), while disregarding the role MCJA's own training design played in creating the circumstances and the evidence ambiguity.

107.    MCJA's and the Board's decision to revoke Peters's long-held certificates of eligibility, based on a single disputed OC-training incident, without any criminal conviction and in the face of a closed criminal investigation with no prosecution, was grossly disproportionate to any legitimate regulatory objective and was arbitrary and capricious. The decision ignored nor discounted the exculpatory and mitigating effects demonstrated by the video evidence and the OC-Spray induced impairment deliberately inflicted upon Peters along with the fact that no MCJA approved female search curriculum was ever taught. It also functioned as a career-ending and reputation-destroying sanction untethered from a fair assessment of culpability in a scenario designed by the State itself to impair vision and judgment at the very moment the Academy demanded delicate, bodily intrusive contact. The decision ignores Peters's years of exemplary service as a law enforcement and corrections officer without any previous allegations or findings of sexual misconduct.

108.    Defendants' course of conduct—state-created risk combined with deliberate indifference to that risk and draconian sanctions imposed through a process structurally inclined to validate institutional decisions—shocks the conscience and constitutes an arbitrary abuse of government power in violation of Peters's substantive due-process rights.

109.    As a direct and proximate result of Defendants' substantive due-process violations, Peters has suffered the damages set forth above.

### COUNT III – 42 U.S.C. § 1983: FOURTEENTH AMENDMENT "STIGMA-PLUS" OCCUPATIONAL / LIBERTY-INTEREST DEPRIVATION
### (Against Rumsey, Peck, Gilbert, Black, Love, Liberty, King, and Does, in Individual and Official Capacities)

110.    Peters realleges and incorporates by reference paragraphs 1 through 109 as if fully set forth herein.

111.    By publicly declaring in the November 20, 2025, Notice of Intent to Revoke and related documents that Peters's conduct "constitutes the Class D crime of assault" under 17-A M.R.S. § 207(1)(A), and that he engaged in "physical sexual harassment" and "unwelcome sexual contact" with a fellow cadet, Defendants Rumsey, Peck, Gilbert, Black, Love, Liberty, King, and Does placed a defamatory stigma on Peters that impugned his moral character, professional fitness, and law-abidingness.

112.    Those statements were made in official documents disseminated to law-enforcement agencies and to the public in the context of open administrative proceedings under 25 M.R.S. § 2806A(10), and they carry great weight in the close-knit law-enforcement and corrections communities.

113.    At the same time that Defendants made and publicized those stigmatizing findings, they altered Peters's legal status by revoking his certificates of eligibility and extinguishing his ability to work in Maine as a law-enforcement officer or corrections officer.

114.    The combination of stigmatizing, quasi-criminal findings and the revocation of Peters's certifications constitutes a "stigma-plus" deprivation of liberty under the Fourteenth Amendment, triggering a requirement for robust procedural protections and, at minimum, an adequate opportunity for a meaningful name-clearing hearing before neutral decisionmakers.

115.    As alleged above, Defendants failed to provide constitutionally adequate procedures before or after issuing and publicizing the stigmatizing findings and revoking Peters's certifications. Peters was not afforded a meaningful, impartial opportunity to contest the defamatory conclusions, to present evidence in a fair forum, and to clear his name.

116.    As a direct and proximate result, Peters has suffered and continues to suffer significant

damage to his reputation and standing in the community, the permanent loss of his ability to

pursue his chosen occupation, and accompanying emotional and financial harms.

### COUNT IV – STATE-LAW DEFAMATION (SLANDER/LIBEL)
### (Against Rumsey, Peck, Gilbert, Black, and Does, in Individual Capacities)

117.    Peters realleges and incorporates by reference paragraphs 1 through 116 as if fully set

forth herein.

118.    Under Maine law, a person is liable for defamation if he or she publishes a false and

defamatory statement concerning another to a third person, without privilege, causing harm to

the other's reputation.

119.    Defendants Rumsey, Peck, Gilbert, Black, and Does, acting individually and in concert,

published written and oral statements asserting as fact that Peters "grabbed [Cadet] MVH's

breasts" and engaged in "physical sexual harassment" of a fellow cadet, and thereby committed

the Class D crime of assault under 17-A M.R.S. § 207(1)(A).

120.    Those statements were untrue or, at a minimum, expressed factual and legal conclusions

not fairly supported by the ambiguous and compromised evidence, including the OC-training

environment MCJA created and the TAC Center video evidence.

121.    Defendants published those statements in official MCJA and Board documents, including

Gilbert's November 5, 2024, report and the Board's November 20, 2025, Notice of Intent to

Revoke, knowing and intending that such documents would be transmitted to law-enforcement

agencies and become available to the public.

122.    Defendants acted at least negligently, and in some instances recklessly or with actual

malice, in making and publishing those statements, particularly in characterizing disputed

conduct during a flawed training scenario as the statutory crime of assault without a criminal conviction or prosecution and in the face of the State's own decision not to bring charges.

123.    As a direct and proximate result of these defamatory statements, Peters has suffered damages to his reputation, emotional distress, and financial losses.

124.    To the extent any Defendant asserts immunity under the Maine Tort Claims Act or 14 M.R.S. § 8111, Peters alleges, on information and belief, that the defamatory statements were made with malice or in bad faith, and/or were outside the proper scope of such Defendants' discretionary functions, thereby negating any such immunity.

### COUNT V – STATE-LAW INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
#### (Against Peck, Gilbert, Rumsey, Black, and Does, in Individual Capacities)

125.    Peters realleges and incorporates by reference paragraphs 1 through 124 as if fully set forth herein.

126.    Defendants Peck, Gilbert, Rumsey, Black, and Does engaged in extreme and outrageous conduct by designing and/or acquiescing in a training scenario that foreseeably placed Peters in a high-risk position for ambiguous physical contact while acutely impaired by OC, then using his compromised performance as a basis to destroy his career, and then compounding that destruction by publicly branding him a sexual harasser and a criminal assailant without constitutionally adequate process.

127.    Defendants further engaged in extreme and outrageous conduct by summarily dismissing Peters from the BLETP without basic pre-deprivation protections; by ratifying and sustaining that dismissal through a process structurally biased by conflicts of interest and institutional pressure; by declaring in official documents that Peters committed "assault" under 17-A M.R.S. § 207(1)(A) despite the absence of criminal charges or conviction; and by revoking Peters's

hard-earned certifications and permanently foreclosing his chosen profession in conscious disregard of the devastating personal impact.

128.    Defendants either intended to cause Peters severe emotional distress or acted with reckless disregard of the likelihood that their conduct would cause such distress.

129.    As a direct and proximate result of Defendants' actions, Peters has suffered severe emotional distress, including humiliation, anxiety, depression, insomnia, and other psychological harms, requiring ongoing care and adversely affecting his daily functioning and relationships.

130.    To the extent Defendants assert immunity, Peters alleges that their conduct was wanton, reckless, or malicious, thereby taking it outside the protection of 14 M.R.S. § 8111.

## VI.    PRAYER FOR RELIEF

Peters respectfully requests that the Court enter judgment in his favor and against Defendants and award the following relief:

A. A declaration that Defendants, acting under color of state law, violated Peters's rights under the Fourteenth Amendment to the United States Constitution by depriving him of protected property and liberty interests without procedural due process and by engaging in arbitrary and conscience-shocking conduct that violates substantive due process.

B. A declaration that the findings and conclusions in the MCJA Board's November 20, 2025, Notice of Intent to Revoke in Board Case 2024089—specifically including the conclusion that Peters's conduct "constitutes the Class D crime of assault" under 17-A M.R.S. § 207(1)(A) and that he engaged in "physical sexual harassment" of a fellow cadet—are constitutionally invalid and must be vacated and expunged from Peters's records.

C.  An order requiring Defendants, in their official capacities, to reinstate Peters's certificates of eligibility to act as a law-enforcement officer and as a corrections officer in Maine, or, in the alternative, to afford him a new, constitutionally compliant administrative hearing before a truly neutral and conflict-free tribunal, with adequate procedural protections, concerning any proposed suspension or revocation.

D.  An order requiring Defendants, in their official capacities, to remove and expunge from MCJA's and the MCJA Board's records any references to Peters as a sexual harasser or as a perpetrator of "assault" under 17-A M.R.S. § 207(1)(A), unless and until such findings are made by a court of competent jurisdiction after a constitutionally adequate process.

E.  An award of compensatory damages against the individual-capacity Defendants, jointly and severally, in an amount to be determined at trial, for lost wages, lost benefits, loss of future earning capacity, emotional distress, reputational harm, and other actual damages suffered.

F.  An award of punitive damages against the individual-capacity Defendants in an amount sufficient to punish and deter willful or reckless violations of constitutional rights.

G.  An award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1983 and applicable state law.

H.  An award of prejudgment and post-judgment interest as allowed by law.

I.  Such other and further legal and equitable relief as the Court deems just and proper under the circumstances.

Dated: February 19, 2026             _/s/ Walter H. Foster IV_____

Walter H. Foster IV, Esq. – Bar No. 11047
Attorney for Plaintiff
STEVE SMITH TRIAL LAWYERS

191 Water Street
Augusta, ME 04330
Tel: (207) 622-3711
Walter@AmericanTrialGroup.com